UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 07-cr-00338-MSK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

THOMAS BADER,

    Defendant.

_____

**OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY
ORDER OF FORFEITURE**
_____

**THIS MATTER** comes before the Court pursuant to the Government's Motion for Preliminary Order of Forfeiture of Property **(# 588)**, Mr. Bader's response **(# 591)**, and the Government's reply **(# 629)**, and Mr. Bader's surreply **(# 641)**.[1]

On February 2, 2010, the jury returned guilty verdicts against Mr. Bader on Counts 1 (conspiracy to facilitate the sale of smuggled goods, 18 U.S.C. § 371, § 545); 12-15 (unlawful distribution of human growth hormone, 21 U.S.C. § 333(e)); 17 (facilitating sale of smuggled goods, 18 U.S.C. § 545); 19 (conspiracy to possess with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1), § 846); 20 (possession of human growth hormone with intent to distribute, 21 U.S.C. § 333(e)); and 21-43 (unlawful distribution of human growth hormone to minors, 21 U.S.C. § 333(e)) of the Indictment. The Court subsequently granted **(# 650)** a judgment of acquittal to Mr. Bader on Counts 21-43. The jury also made findings sufficient to

---

[1]Mr. Bader did not seek or obtain leave to file a surreply. Nevertheless, the Court has considered the arguments raised therein, and finds that they do not alter the outcome.

1

support the Government's request for forfeiture pursuant to 21 U.S.C. § 853(a) of $ 4.8 million in cash and a parcel of real property, located at 3505 Austin Bluffs Parkway, Colorado Springs, Colorado. In a previous Order **(# 650)**, the Court has found sufficient evidence to warrant the jury's forfeiture verdict with regard to the $ 4.8 million. This Order concerns Mr. Bader's argument that forfeiture of the real property would amount to a penalty that by amount and proportion to the offense would violate the Eighth Amendment to the United States Constitution's "excessive fines" clause.

The parties agree as to the general contours of the analysis to be used with regard to this issue. They agree that the Eighth Amendment's "excessive fines" clause applies to criminal forfeitures, and to survive Eighth Amendment scrutiny, the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. *U.S. v. Bajakajian*, 524 U.S. 321, 334 (1998). They agree that the Government bears the initial burden of showing that "the connection between the property and the offense is more an a fortuitous or incidental one." *U.S. v. Wagoner County Real Estate*, 278 F.3d 1091, 1101 n. 8 (10th Cir. 2002), *citing U.S. v. 829 Calle De Madero*, 100 F.3d 734, 737 (10th Cir. 1996). The jury's verdict has conclusively resolved that issue. The jury was asked to determine whether the property "was used, or was intended to be used, in any manner or part, to commit or to facilitate the commission of the crime(s)" and instructed that "[t]here must be more than an incidental connection between the property and the offense for you to find that the property facilitated, or was intended to facilitate, the commission of the offense." Thus, the Government has met its initial burden.

The burden then shifts to Mr. Bader to show that the forfeiture amount is "grossly disproportionate" to the gravity of the crime. *Wagoner*, 278 F.3d at 1101 n. 8. In making that determination, the Court examines several factors: (I) Congress' judgment about the appropriate punishment for the offense, as reflected in the maximum statutory fine for the counts of

conviction and the fines set out in the Sentencing Guidelines; (ii) the gravity of the offense and extent of criminal activity; (iii) any related illegal activities; (iv) the harm caused to other parties; (v) the general use of the forfeited property; (vi) any previously imposed federal sanctions; (vii) the benefit to Mr. Bader reaped by the criminal conduct; (viii) the value of the property; and (ix) the property's connection to the offense.[2] *Wagoner*, 278 F.3d at 1100.

Although he did not do so via affidavits or other evidentiary material, Mr. Bader has made certain allegations about the property at issue. The Government, although purporting to dispute the accuracy of these representations, offers no evidence to the contrary. Accordingly, the Court accepts the representation that the Austin Bluffs Parkway property has a market value of approximately $ 4.2 million and is subject to an oustanding mortgage of approximately $780,000, leaving Mr. Bader to forfeit approximately $3.42 million in equity. Approximately 75% of the floor space in the property is leased to other entities not involved in this case, with College Pharmacy occupying the remaining 25% of the property.[3] Mr. Bader's post-trial

---

[2] Mr. Bader argues that the Court should also take into account the effect that such a forfeiture will have on him – *i.e.* that it will deprive him of the ability to care for his family during and following his incarceration. It is not clear to what extent this is a factor that is appropriately considered, *see Bajakajian*, 524 U.S. at 340 n. 15 (noting that the defendant "does not argue that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood," and thus, the Court did not address it), but to the extent it is, this Court finds it unavailing. Mr. Bader acknowledges that he possesses three unencumbered properties whose "value in total is probably at $ 700,000." By Mr. Bader's own admission, the forfeiture proposed here may not allow him to continue to lead the lifestyle he may have become accustomed to, but it will in no sense leave him destitute.

[3] Mr. Bader argues that, within the 25% of the building that College Pharmacy occupied, only a small fraction was used to operate the "clean room" in which the human growth hormone at issue in this case was compounded. Thus, he contends, the amount of the building tainted by the illegal conduct is far less than 25%. This argument is without merit. The actual preparation of the drugs by College Pharmacy staff are only one aspect of the criminal conduct here. Mr. Bader used College Pharmacy's computers and telephones to order shipments of raw human growth hormone and to receive prescriptions for growth hormone to be filled. He held meetings with College Pharmacy employees to discuss advertising strategies for the company's growth hormone product – meetings that, obviously, occurred somewhere other than the "clean room." He traveled to conferences to represent College Pharmacy and solicit customers. The activities

3

arguments notwithstanding, the evidence at trial established that the value of the foreign-made human growth hormone received by College Pharmacy amounted to $ 4.8 million, and the sales of testosterone cypionate (Count 19) resulted in an additional, yet not precisely quantified, amount of revenue.[4] The Court does not recall there being evidence presented – and the parties do not point to any – that establishes the degree to which unlawful sales of human growth hormone and testosterone cypionate contributed to College Pharmacy's overall revenues.

With these factors in mind, the Court turns to the various *Wagoner* factors.[5]

**A. Congressional valuation of crime, benefits reaped by Mr. Bader**

The Court turns first to the statutory fine permitted based on the counts of conviction. The 10th Circuit has described the comparison between the value of the property to be forfeited and the maximum statutory fine available for the crime as "one of the most important" factors to be evaluated. *Wagoner*, 278 F.3d at 1100. Such fines "provide guidance on the legislative view of the seriousness of the offense," and, if the value of the property to be forfeited is "within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." *Id., citing Bajakajian*, 528 U.S. at 338-39.

The Government argues, without apparent dispute by Mr. Bader, that each count of conviction would give rise to a maximum fine of $ 250,000, pursuant to 18 U.S.C. § 3571(b)(3).

---

facilitating crimes in this case entail the entirety of College Pharmacy's operations, not just the "clean room."

[4]Because of the lack of clear evidence regarding the value of testosterone cypionate sales, the Court will disregard the revenue from such sales in calculating the gain to College Pharmacy and Mr. Bader. Thus, the Court limits itself the evidence that College Pharmacy and Mr. Bader obtained $ 4.8 million in gain from sales of unlawfully-imported human growth hormone for purposes of this issue.

[5]The Court does not discuss each identified factor independently. In many respects, the factors overlap, or the analysis of one factor adequately addresses all material concerns touching on another factor. Accordingly, the Court aggregates the factors into related categories.

4

Although the Government initially calculated this sum as being $ 7.75 million (31 counts x $250,000 per count), that calculation was made prior to the Court's order granting judgment of acquittal on Counts 21-43. The 8 remaining counts of conviction yield a possible statutory maximum fine under 18 U.S.C. § 3571(b)(3) of $ 2 million.

Alternatively, the Government argues that, pursuant to 18 U.S.C. § 3571(d), the maximum fine to be imposed may be "twice the gross gain" obtained by the defendant. In this case, the jury concluded that College Pharmacy – and by extension, Mr. Bader – grossed $ 4.8 million in revenue from the sale of the unlawfully-imported human growth hormone, and thus, the maximum fine that may be imposed against Mr. Bader under 18 U.S.C. § 3571(d) is $ 9.6 million.

With regard to the Sentencing Guidelines, the Government indicates, without dispute from Mr. Bader, that the recommended fine range is between $ 12,500 and $ 125,000 per count. Based on the 8 counts of conviction, this sum yields a fine range of $ 100,000 to $ 1 million. The Court has reviewed Mr. Bader's briefs, and finds nothing therein that disputes these calculations or argues that a different range of fines should be considered.

**B. Gravity and extent of offense**

The next *Wagoner* factor examines the gravity of the offense and the extent of the criminal activity. In general, the Court finds that Mr. Bader's criminal conduct was serious. As the Court explained during sentencing, Mr. Bader consciously and intentionally sought to evade FDA regulation of human growth hormone products, thereby introducing large amounts of an unregulated and uninspected drug product into commercial channels - putting it in the hands of an unknowing public. Mr. Bader did so by seeking to exploit a loophole that he perceived in the federal regulatory scheme - the ability of pharmacists to compound drugs. By compounding human growth hormone that he imported from China at a fraction of the cost of the same

5

regulated drug, he hoped to gain a competitive advantage over pharmacies who were only able to supply FDA-regulated preparations.

It is undisputed that, in most respects, Mr. Bader's product was chemically identical to FDA regulated commercially prepared human growth hormone products such as Saizen. But it is such regulation and oversight that the public relies upon to ensure that mass-produced[6] drug products are safe and effective. Congress created the FDA and endowed it with authority to regulate drug manufacturing precisely to ensure that uniform standards and practices were reliably followed in order to assure drug efficacy and safety. Although Mr. Bader may believe that his own manufacturing standards and practices were at least as rigorous as those required by the FDA, but the regulatory scheme does not confer upon individual pharmacists the right to unilaterally make such assessments. Perhaps even more importantly, because the public relies upon regulation, pharmacists are not free to supply unregulated drugs under the auspices of having been FDA approved.[7] The significance of this concern was demonstrated by the trial testimony of a physician who was horrified to learn that the HGH that he obtained for his sons

---

[6]Admittedly, Congress and the FDA have deferred to states to regulate "traditional compounding" of drugs on an individualized and *ad hoc* basis, evidencing a willingness to sacrifice some safety and efficacy concerns in favor of increasing the ability of the public to obtain customized drug preparations when needed. However, as the Court has discussed in prior orders, Congress and the FDA have clearly identified the line between "traditional compounding" and mass-production of drugs in the guise of compounding, the latter of which Congress intends the FDA to regulate. The Court has previously explained that the jury's verdict here makes clear that the jury considered Mr. Bader's human growth hormone product to resemble drug manufacturing.

[7]The fact that none of Mr. Bader's customers actually suffered adverse effects from the use of the products (at least, the record does not reflect that anyone did) does not significantly affect the analysis. One might say that the lack of reported adverse effects is a testimony to Mr. Bader's voluntary efforts to ensure that his compounded growth hormone product met or exceeded FDA standards for commercial growth hormone preparations. Or, one might attribute the lack of complaints to an unwillingness on the part of many customers using the products for unapproved medical purposes to report adverse health effects, or to mere fortuity, or to any of a host of other explanations. It is not necessary that a risk to manifest itself before the Court may conclude that the risk exists.

was not a "generic" version of the drug as he had been led to believe by Mr. Bader, but instead an unregulated, uninspected, smuggled import from China. Thus, the Court finds Mr. Bader's distribution of several million dollars worth of an unregulated drug product posed a serious risk to public health and safety.

The seriousness of Mr. Bader's conduct contrasts sharply with that of *Bajakajian*, one of the few cases in which a forfeiture was found to be unconstitutional. In *Bajakajian*, the Supreme Court found that a defendant's failure to declare to customs the large amount of U.S. currency he was carrying was not so serious an offense as to warrant forfeiture of the entire $ 357,000 at issue. The Court found that the crime at issue was "solely a reporting offense," that the harm caused was "minimal . . . affect[ing] only one party, the Government, and in a relatively minor way," and that "had the crime gone undetected, the Government would have been deprived only of . . . information." *Id.* at 339. Given the minimal gravity of the offense, the Court concluded that a $ 357,000 forfeiture was grossly disproportionate.

Compared to *Bajakajian* – where the harm caused by the criminal conduct was inconsequential – Mr. Bader's conduct was serious, both in scope and magnitude. While generating several million dollars in revenue, Mr. Bader risked the health and peace of mind of many patients. Mr. Bader was extensively involved with the criminal conduct; he moved to Colorado because it had lax laws with regard to compounding, he devised the idea to exploit the alleged loophole in federal drug regulation to create "compounded" human growth hormone that ostensibly fell outside federal oversight, he approved the advertisements for the product and hawked it at trade shows and medical conferences.[8] One can hardly say that, as in *Bajakajian*,

---

[8] Admittedly, there is less evidence in the record to show that Mr. Bader was personally involved with specific transactions, but it cannot be disputed that it was Mr. Bader's actions that set the entire scheme in motion and perpetuated it.

7

the underlying criminal conduct here was "minimal."

### C. General use of forfeited property/harm to others

The parties agree that the real property at issue is commercial in nature and that 75% is occupied by tenants other than College Pharmacy. There is no indication that forfeiture of the property by Mr. Bader would have any effect on the tenants; if the property changed hands, they would simply make payments to a new landlord.

Mr. Bader argues that, because the illegal activities occupied such a small component of a larger piece of property, the Court should fashion a forfeiture remedy that does not extend to the whole of the property. Mr. Bader's argument on this point cites two cases: *U.S. v. Austin*, 509 U.S. 602 (1993 ), and *U.S. v. Real Property Located in El Dorado County*, 59 F.3d 974 (9th Cir. 1995). Neither case is particularly instructive.

In *El Dorado County*, a landowner was convicted of having an "elaborate marijuana grow operation" on a portion of a 29.6 acre parcel of land. In vacating the trial court's order of forfeiture and remanding the matter back to the trial court for additional fact-finding, the 9th Circuit mused about the "severability" question, explaining that "in some instances, the apparently forfeitable property may include a portion not properly forefeitable as an instrumentality of the crime," and that "the offending property must be separated from the property not involved in the criminal activity." 59 F.3d at 986 n. 4. It explained that "dividing the property is appropriate where the property consists of two separate (and readily severable) parcels, only one of which is tainted." *Id.* On the other hand, the court also acknowledged that "the general rule is that adjacent tracts of land conveyed as a single parcel by a single deed to the defendant should be treated as one, indivisible piece of property subject to forfeiture," and that the burden is on the defendant to show "a feasible way to separate the property involved in the offense from the remainder." *Id.*, n. 15.

*El Dorado*, with its focus on "parcels" of land, is not particularly helpful here, where the issue involves a single building that has arguably tainted and untainted floor space. The analysis in *El Dorado*, which allows the property owner to prove that a single parcel should be broken into parts by showing that the parts "are separately described in local land records" or "are physically separated from each other, i.e. by a road or creek" posits a scheme suitable for determining the severability of large swaths of real property, not the divisibility of a single building. It is impossible for the Court to sever the Austin Bluffs Parkway building into "parcels" and declare forfeit only that portion occupied by College Pharmacy. Thus, *El Dorado*'s focus on physically severing untainted parcels of land from tainted ones is of little assistance here.

*Austin* is equally unhelpful. In that case, the defendant was convicted of unlawful drug sales, having agreed to and consummated the drug sale in his auto body shop, and having made a detour to his mobile home to retrieve the drugs to be sold. The trial court granted the Government's request for forfeiture of both the auto body shop and mobile home over the defendant's Eighth Amendment objections, finding that it was foreclosed from addressing the proportionality of the offense and the property subject to forfeiture. The Supreme Court reversed, finding that a proportionality analysis was required, and remanded the matter to the trial court to conduct such an analysis. Mr. Bader points the Court to a concurring opinion by Justice Scalia which, while joining the majority opinion, posited that, historically, forfeitures were permitted only to the extent that the property in question was an instrumentality of the offense, and that property that had a more remote connection to the crime was not forfeitable. *Id.* at 627-28 ("Scales used to measure out unlawful drug sales, for example, are confiscable whether made of the purest gold or the basest metal. But an *in rem* forfeiture goes beyond the traditional limits that the Eighth Amendment permits if it applies to property that cannot properly

9

be regarded as an instrumentality of the offense-the building, for example, in which an isolated drug sale happens to occur").

Justice Scalia's concurrence is of little value here. The real property in question – or at least a significant part of it – <u>was</u> an instrumentality of the crime. It housed the business through which Mr. Bader committed the crime; in Justice Scalia's words, the real property here is equivalent to the scale with which the illegal drug was measured. *Austin* does not attempt to address the more difficult question of how – if at all – to apportion a forfeiture of a single piece of property that has both tainted and untainted aspects, and thus, it does little to advance Mr. Bader's argument that the Austin Bluffs Parkway building is not forfeitable in its entirety.

In cases involving forfeitures of multi-use buildings, courts have generally found that the presence of untainted areas in the building did not render forfeiture of the entire building unconstitutional. In *U.S. v. One Parcel of Real Property*, 395 F.3d 1 (1st Cir. 2004), the defendant was convicted of dealing drugs from her first-floor residence in a three-family home she owned, the remainder of which she rented to others. The court rejected an Eighth Amendment argument challenging the forfeiture of the property, finding that although the property being forfeited was "significant," her "culpability and the gravity of the crime" nevertheless rendered forfeiture of the entire property constitutional. *Id.* at 6.

In *U.S. v. 141st Street Corp. by Hersh*, 911 F.2d 870, 881 (2d Cir. 1990), a case predating the current Supreme Court jurisprudence on the issue, the court considered a civil forfeiture proceeding brought against a six-story, 41-apartment building, after police arranged narcotics purchases in 17 of the apartments and observed individuals using narcotics in common areas on each floor of the building. The court addressed two questions relating to the forfeiture issue. First, it held that the forfeiture statute in question, 21 U.S.C. § 887(a)(7), "indicates Congress' intent that an entire parcel of land may be subject to forfeiture even if only part of it is directly

connected to drug activity."⁹ 911 F.2d at 880.  Thus, it concluded, "the building as a whole, rather than specific apartments, was subject to forfeiture." *Id.*  Second, the court considered the property owner's Eighth Amendment argument.  The court concluded that the Eighth Amendment analysis did not apply – a conclusion that is inconsistent with later Supreme Court precedent such as *Austin* and *Bajakajian* – but went on in dicta to conclude that, even if an Eighth Amendment inquiry was appropriate, "the line at which forfeiture becomes disproportionate punishment or an excessive fine certainly has not been crossed in this case where apartments on every floor of the building-amounting to at least one third of all of the apartments in the building-were used for narcotics trafficking."

This Court finds these cases instructive.  Here, it is undisputed that a part of 3505 Austin Bluffs Parkway was used to facilitate the commission of the crimes herein.  Under the persuasive reasoning of cases such as *141ˢᵗ St. Corp.* and *U.S. v. Two Parcels of Property*, 31 F.3d 35, 40 (2d Cir. 1994), a statute such as 21 U.S.C. § 853 should be read to conclude that "an entire parcel is subject to forfeiture when even just a portion of that parcel is used to facilitate a [drug] offense." *See also U.S. v. Garcia-Guizar*, 160 F.3d 511, 519 (9ᵗʰ Cir. 1998) (reading § 853 similarly).  Moreover, as cases like *One Parcel of Real Property* recognize, the fact that the real property contains untainted, income-producing floor space and tenants does not preclude a forfeiture of the entire building that is otherwise appropriate.  Moreover, as *141ˢᵗ St. Corp.* explains, where the tainted property amounts to a significant portion of the whole – there, at least 1/3 of the apartments; here, 25% of the building's floor space – forfeiture of the whole may be appropriate.  Accordingly, the Court rejects Mr. Bader's argument that the presence of untainted

---

⁹The statute at issue here, 21 U.S.C. § 853(a)(2), contains similar language – it authorizes forfeiture of "any of the person's property used . . . in any manner or part . . . . to commit or to facilitate" the crime.

11

tenants in the remainder of the real property should prevent, in part or whole, an order of forfeiture.

**D. Other sanctions imposed**

Mr. Bader is subject to two different forfeitures in this action: a forfeiture of $ 4.8 million in proceeds from the crimes, 21 U.S.C. § 853(a)(1), and forfeiture of the real property as an instrumentality of the crime, 21 U.S.C. § 853(a)(2). The question arises as to whether the Eighth Amendment analysis of the proportionality of the real property forfeiture is made with the forfeited proceeds in mind, or whether the forfeiture of the $ 4.8 million proceeds is excluded from the Eighth Amendment analysis.

There is some justification for considering money subject to forfeiture as proceeds under § 853(a)(1) separately from property subject to forfeiture as an instrumentality of the crime under § 853(a)(2). Proceeds forfeiture is essentially restitutional, not punitive, in nature – it merely divest the defendant of ill-gotten gains. Thus, a proceeds forfeiture is not typically subject to an Eighth Amendment analysis. *See generally U.S. v. Wild*, 47 F.3d 669, 676 (4th Cir,. 1995), *citing U.S. v. Alexander*, 32 F.3d 1231, 1236 (8th Cir. 1994); *see also U.S. v. Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1395-96 (10th Cir. 1997) ("as a matter of law, forfeiture of drug proceeds . . . can never be constitutionally excessive"). Because forfeiture of proceeds is not considered to be punishment, it should logically be excluded from an Eighth Amendment analysis, as the very premise of the Eighth Amendment analysis is that forfeiture of property is a punishment akin to a fine, thus invoking the Eighth Amendment's "excessive fines" clause. *See Bajakajian*, 524 U.S. 321, 333-34.

Nevertheless, because there is no clear law addressing the issue, the Court will examine the proportionality of the requested forfeiture of the real property mindful of the fact that Mr. Bader is also subject to a $ 4.8 million forfeiture order relating to the proceeds of the crimes.

12

### E. Balancing the factors

Having made findings with regard to the various factors that bear on the proportionality analysis, the Court now weighs them. The fundamental question is whether the value of the property to be forfeited – $ 3.42 million in equity in the Austin Bluffs Parkway building – is "grossly disproportionate" to the gravity of the crime. As previously discussed, the Court finds that the gravity of the crime is significant, having placed College Pharmacy's customers at risk of harm to their health from unregulated drugs supplied for improper medical purposes. Mr. Bader's crimes were not isolated, fleeting, or impulsive, but instead carefully calculated and conscientiously pursued. Because his crimes were of significant gravity, the fine imposed would have to be remarkably large before the Court could conclude that it was "grossly disproportionate" to the gravity of the offense.

The Court finds that the real property forfeiture does not rise to that level. Taken alone, the $ 3.42 million in equity to be forfeited is significantly larger than the maximum $ 1 million fine contemplated by the Sentencing Guidelines, and somewhat larger than the $ 2 million maximum statutory per-count fine that could be imposed, but much less than the $ 9.6 million "two times the proceeds" fine authorized by 18 U.S.C. § 3571(d). (Indeed, even aggregating the $ 4.8 million proceeds forfeiture with the $ 3.42 million property forfeiture, the total is still less than the fine contemplated by 18 U.S.C. § 3751(d).) To the extent the Court must choose among the various maximum fines in order to make a comparison to the proposed forfeiture here, this Court would choose the $ 9.6 million fine permitted under § 3751(d). At heart, Mr. Bader's crimes were commercial in nature – his obvious intention was to exploit a perceived regulatory loophole in order to price-compete with commercially-available human growth hormone products, thus gaining a market share that he could not have otherwise obtained by selling FDA-approved commercial preparations. Because the ultimate motivation for the crime was financial

gain, the statutory maximum fine that is most closely tied to that same financial gain provides the most relevant mans of assessing the severity of the crime. Unlike the blunt, catchall fines provided for by § 3751(a) , the fine provided for by § 3571(d) attempts to scale with the criminal conduct, rising or falling depending on how lucrative the criminal conduct is. Thus, the Court finds the maximum fine provided by § 3751(d) to provide a more realistic estimate of Congress' attempt to place a value on criminal conduct – in essence, a finding that criminally-obtained revenue should be punished at $ 2 for every $ 1 gained. In that respect, it seems appropriate to compare the amount to be forfeited against that same "2 for 1" ratio. In that light, a property forfeiture of $ 3.42 million, even when coupled with a $ 4.8 million proceeds forfeiture, is still less than the maximum monetary punishment that Congress deemed appropriate for such a crime.[10]

The remaining factors do not tip the balance in favor of Mr. Bader. Forfeiture of the real property will not cause any harm to third party tenants of the building. There is no basis for partitioning or otherwise attempting to segregate that portion of the building used for College Pharmacy from the remainder of the building for forfeiture purposes; indeed, courts have regularly endorsed wholesale forfeiture of a building that was only partially used for illegal activities.

Accordingly, the Court finds that Mr. Bader's contention that the Government's requested forfeiture of the Austin Bluffs Parkway property would violate the Eighth Amendment is without merit. The Government's Motion for Preliminary Order of Forfeiture **(# 588)** is

---

[10]Were the Court to instead conclude that the maximum per-count fine – a total of $ 2 million – was the proper comparator, it would nevertheless conclude that the value of property to be forfeited is less than 175% of the maximum statutory fine, an amount far lower than "many orders of magnitude" by which the forfeiture exceeded the statutory fine in *Bajakajian*. 524 U.S. at 340. One might say that the real property forfeiture proposed here is "disproportionate" to the maximum per-count statutory fine, but not "grossly" so.

**GRANTED**, and the Government's proposed Preliminary Order of Forfeiture will enter contemporaneously with this Order. The Judgment of Conviction **(# 679)** is **AMENDED**, pursuant to Fed. R. Crim. P. 32.2(a)(4)(B) and 36, to include reference to the Preliminary Order of Forfeiture and, to the extent it was omitted, the Court's finding that Mr. Bader is subject to forfeiture of the $ 4.8 million in proceeds.

Dated this 1st day of July, 2010.

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge